UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MARJORIE T. MENDEZ,                              :

                    Plaintiff,                   :       13 Civ. 3618 (GWG)

          -v.-                                   :       OPINION & ORDER

CAROLYN W. COLVIN,                               :
Acting Commissioner of Social Security,
                                                 :
                    Defendant.                   :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Marjorie Mendez brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security

(the "Commissioner") denying her claims for Disability Insurance Benefits and Supplemental

Security Income ("SSI") under the Social Security Act.  Both Mendez and the Commissioner

have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.  The parties consented to disposition of this matter by a United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, both motions are granted in

part and denied in part.  The case is remanded for further proceedings.

I.  BACKGROUND

        A.  Mendez's Claim for Benefits and Procedural History

        Mendez applied for disability and SSI benefits on June 10, 2010.  See Administrative

Record, filed Mar. 19, 2014 (Docket # 20) ("R."), at 71-122.  In the portion of the application

asking how Mendez's "illnesses, injuries or conditions limit [her] ability to work," Mendez

wrote "diabetes, back pain, depression, migraines."  R. 114.  Mendez is insured for benefits

1

through December 31, 2015.  R. 80.  Mendez was born on May 27, 1976, R. 71, and most

recently worked as a "child care provider," R. 98.

On December 11, 2010, the Commissioner denied Mendez's application for disability

and SSI benefits.  R. 31-33.  Mendez requested a hearing before an Administrative Law Judge

("ALJ").  R. 34-35.  The ALJ held a video hearing on November 9, 2011.  R. 319-381.  On

February 29, 2012, the ALJ issued a decision finding that Mendez was not disabled.  R. 15-23A.

Mendez appealed the ALJ's decision to the Appeals Council.  R. 7-11.  On March 29, 2013, the

Appeals Council denied Mendez's request for review.  R. 3-5.

On May 28, 2013, Mendez filed this lawsuit under 42 U.S.C. §§ 405(g) and 1383(c)(3).

See Complaint, filed May 28, 2013 (Docket # 2).  Both Mendez and the Commissioner have

moved for judgment on the pleadings.[1]

B.  The Administrative Record

Mendez and the Commissioner have each provided a summary of the relevant evidence

contained in the administrative record.  See Pl. Mem. at 2-10; Comm'r Mem. at 1-10.  The Court

adopts the parties' summaries, which do not conflict in any material way, as accurate and

complete for purposes of the issues raised in this suit.  We discuss the portions of the record

pertinent to the adjudication of this case in section III below.

---

[1] See Notice of Motion, dated Jan. 21, 2014 (Docket # 14); Plaintiff's Memorandum of
Law, dated Jan. 21, 2014 (Docket # 15) ("Pl. Mem."); Notice of Motion, dated Mar. 26, 2014
(Docket # 21); Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the
Pleadings and in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings,
dated Mar. 26, 2014 (Docket # 22) ("Comm'r Mem."); Plaintiff's Reply Memorandum of Law,
dated Apr. 9, 2014 (Docket # 23) ("Pl. Reply").

C.  <u>The Hearing Before the ALJ</u>

A hearing before ALJ Gerardo Perez was held on November 9, 2011.  R. 321-81.  The

ALJ was in San Juan, Puerto Rico, and conducted the hearing by video teleconference.  R. 321.

Two witnesses who testified before the ALJ were also in San Juan: Dr. Jose Rolon Rivera, a

medical expert, and Luis Serrano-Vega, a vocational expert.  <u>Id.</u>[2]  Mendez and her attorney were

in the Bronx.  <u>Id.</u>  We provide a summary of each witness's testimony.

Mendez has had migraine headaches since she was a child and they have worsened over

time due to her diabetes.  R. 328.  Her headaches are "[v]ery painful," and she "can't stand the

sunlight or noise" when she has them.  R. 329.  She previously took Zantrex for migraines, but

that did not work, so Mendez started another medication which "helps [her] more."  R. 329-30.

The new medication "calms it down . . . smooths it and takes it away."  R. 330.  Mendez has

migraines approximately two times a week.  <u>Id.</u>  Mendez also experiences back pain that

"doesn't let [her] do a lot of things because it hurts so bad."  R. 330-31.  The left side of her

body "gets numb . . . like a tingling feeling on [her] feet."  R. 331.  She takes a muscle relaxant

called Flexeril for her back problems.  <u>Id.</u>  The ALJ asked about her bulging and herniated discs

and asked if anybody had discussed surgery with her.  Mendez responded, "[n]o . . . I was doing

therapy . . . for it."  R. 331-32.  Mendez has not been prescribed any assistive devices for

walking.  R. 332.  Mendez's diabetes is "controlled, but when it acts up, it can go very high" and

she has to "take more doses of the medicine."  R. 333.  She agreed that the diabetes is "generally

controlled, but it occasionally spikes."  <u>Id.</u>  Mendez added that this is "another reason . . . [she

---

[2]  Although Rivera and Vega's names are transcribed differently in the hearing transcript,
we use the spellings as contained in the ALJ's written decision.

doesn't] watch the kids [she] used to watch."  Id.  She has had one emergency room visit since 2010 for such an episode.  Id.

Mendez can cook, do laundry, dress herself, and wash dishes.  R. 335.  She can sweep, dust, and iron, but not mop, because mopping puts pressure on her back.  R. 336.  She cannot bend down to scrub the toilet or bathtub for the same reason.  Id.  Mendez goes grocery shopping but does not carry groceries and instead has someone deliver them to her.  R. 337.  On a "bad day," Mendez can "hardly bend" and stays in bed because she "can't even get up . . . to prepare . . . a meal."  R. 336.  "[B]ad days" occur approximately three days a week, even when she takes medication.  R. 337.  Mendez travels by bus, car services, or asks her children's father to drive her around where she needs to go.  R. 337-38.  She does not drive because she does not have a license and is "too afraid."  R. 338.

Mendez told the ALJ that she has also been seeing a psychiatrist, and the ALJ responded that he did not have any of her mental health records.  R. 338-39.  Mendez's attorney stated that Mendez receives psychiatric treatment at Gouverneur Hospital, and the attorney stated she would follow up to see what treatment records they had, as none were provided in response to the release form sent there.  R. 339.  The ALJ had records from Gouverneur only related to diabetes, back problems, and headaches.  R. 340.

Mendez next testified that when her glucose is high, her hand trembles, her vision gets blurry, and it is hard for her to focus.  R. 341-42.  It takes one or two hours before things are "back to normal," meaning the trembling stops and vision returns to normal.  R. 342.  Mendez experiences such episodes "like, every other day."  Id.  When she experiences high blood sugar, Mendez checks her blood sugar, takes her medication, has something to eat, and then lies on her bed to relax and "let the medicine and the food work for [her]."  R. 344.  When her blood sugar

is low, she gets "the trembles," gets cold and nauseous, and "throw[s] up." Id.  Such episodes

occur about once a week and last about three hours.  R. 343.  When she experiences low blood

sugar, Mendez also checks her blood sugar before "drink[ing] a little something to try to bring it

up" and relaxes in her room to bring the blood sugar back to normal levels.  R. 344.

     With respect to her headaches, Mendez testified that they feel like "someone is drilling in

[her] head" on the left side.  R. 345.  On a scale of 1 to 10, with 10 being the highest level of

pain, her headaches are a "10."  Id.  Even with medication, the headaches last anywhere from a

couple of hours to two days.  Id.  When Mendez gets headaches, she goes in her room and turns

off the lights and television or soaks in a hot tub.  Id.  The headaches worsened with the onset of

her diabetes, and her uncle helped her with her babysitting job when she had a painful episode,

though it is not clear from Mendez's testimony how many times he helped her.  R. 346-47.  She

would ask her uncle to watch the baby because the noise from crying exacerbated her pain, and

she would go lie down in another room.  R. 347.  At times, Mendez had called the parents to tell

them to come pick up their children due to a headache, and she would sometimes ask them not to

bring the children back the next day so she could "simmer [her]self."  R. 347-48.  Mendez does

not normally go to the hospital for headaches because she is on medication and takes it "as

directed."  R. 348-49.

     The ALJ expressed some concern that he was being asked to accept Mendez's testimony

as to the frequency and severity of her headaches "without medical documentation proving it,"

and he also stated that the medical records documenting complaints of migraines are "based on

the history [Mendez] provides."  R. 349.  In response to the ALJ's question, Mendez stated that

her new migraine medication has helped improve her condition.  R. 355.  Although it is not

entirely clear from the record, her testimony indicated that the medication, along with some

5

black coffee, eases the pain though perhaps not the frequency of the headaches.  R. 358-59.

Mendez had never been seen by a neurologist.  R. 357.  As for her back pain, Mendez

experiences it two or three times per week, and it is worse on cold and rainy days.  R. 346.

The ALJ asked Dr. Rivera questions pertaining only to Mendez's physical condition, as

Dr. Rivera is not a psychiatrist.  R. 359.  Dr. Rivera testified that the following impairments are

"established in the record": lower back pain, herniated discs, diabetes mellitus, and headaches.

R. 360-61.  Dr. Rivera noted that in a consultative examination of Mendez with an internist in

July 2010, the internist assessed no physical limitations.  R. 361-62.  The record showed high

blood pressure, but this was controlled with medication.  R. 363.  The record did not show

complications from diabetes.  Id.  Although it is not clear from the transcript, Dr. Rivera

appeared to add that a laboratory report suggested that Mendez's diabetes was "not controlled,"

even though other medical records seemed to indicate that it was controlled.  R. 364.  Dr. Rivera

stated his opinion that Mendez does not have "an impairment or combination of impairments

considered together that meet or equal any listings."  R. 365.

Mendez's attorney also questioned Dr. Rivera.  R. 365.  When asked if the consultative

examination was consistent with the rest of the record, Dr. Rivera responded in the affirmative.

R. 366.  Dr. Rivera then stated that the consultative examiner's opinion would not be consistent

with a finding that Mendez had "decreased range of motion in the lumbar spine."  Id.  Mendez's

attorney pointed out, however, that elsewhere in the record there are "repeated findings of

decreased range of motion and decreased strength."  R. 368-69.  Dr. Rivera stated that if an

individual is complaining of headaches, the way to "report that to their doctor" is to "[t]ell him."

R. 369.  Mendez's attorney asked Dr. Rivera if the high glucose or hemoglobin readings in the

record "could result in the feelings that Ms. Mendez describes that she gets when she has

high . . . blood sugar," to which Dr. Rivera responded in the negative.  R. 370.  He added that those symptoms are "not compatible with high blood sugar."  Id.  What would be consistent with high blood sugar, according to Dr. Rivera, would be blurry vision, fatigue, weakness, and frequent urinary tract infections.  R. 370-71.  Mendez interjected that she had visited Gouverneur twice for such infections, though the ALJ noted that he had no records for those visits.  R. 372-73.  Dr. Rivera stated that there is "no evidence of the lumbar condition" after October 1, 2010, meaning there were no treating records for that condition.  R. 369.

The ALJ then examined Mr. Vega, the vocational expert.  R. 373.  Vega stated that Mendez had past relevant work as a child monitor/babysitter, which is a "medium" performance level and semi-skilled job.  R. 374.  Vega testified that a person confined to "light" work could not perform Mendez's past work because that work is classified as medium work.  R. 375-76.  The ALJ asked Vega to assume a person who could perform a full range of light work but would have to miss work twice a month due to migraines, and Vega testified that such a person would not be prevented from performing light work.  R. 376-77.  The ALJ changed the hypothetical to assume a person who would have to miss one day a week because of migraines, and Vega testified that there would be no work available for such a person.  R. 377.

The ALJ asked about an individual who could perform sedentary work but who was limited to occasional climbing, occasional balancing, stooping, kneeling, crouching, and crawling.  Id.  Vega responded that such a person could perform work as a "charge account clerk," "call out operator," and "order clerk, food and beverage."  R. 378.  The ALJ changed the hypothetical to reflect an individual who has to "remove herself from the job" two times a week, meaning she would not leave the building but would "stop what she's doing and take an extra break" for 15 to 30 minutes while she "recovers from her headache."  R. 379.  Vega responded

that such a person would be "out of work twice a week, up to 30 minutes, in addition to breaks" and that "with those severe restrictions, this person couldn't engage in any work activity" on a sustained basis.  Id.

    D.  Post-Hearing Evidence

After the hearing, the vocational expert submitted a response to a written interrogatory that had been supplied by the ALJ.  R. 383-86.  The interrogatory mirrored the hypothetical question posed by the ALJ at the hearing about a person who could perform sedentary work, except it also asked the vocational expert to assume that the individual is "limited to simple, routine, repetitive work."  R. 384.  The new hypothetical did not incorporate any limitations related to the need to take breaks.  The vocational expert stated that such a person could not perform any of Mendez's past jobs, id., but that this individual could perform "unskilled occupations with jobs that exist in the national economy," R. 385.  The vocational expert identified the following jobs: "order clerk, food and beverage," "surveillance system monitor," and "addresser."  Id.

    E.  The ALJ's Decision

On February 29, 2012, the ALJ issued a decision finding that Mendez was not disabled. R. 15-23A.  The ALJ found that Mendez had not engaged in substantial gainful activity since April 18, 2009, the alleged onset date of her disability.  R. 17.  The ALJ found that Mendez has the following "severe" impairments: diabetes mellitus, degenerative disc disease of the lumbar spine, headaches, and a major depressive disorder.  R. 18.  The ALJ determined that none of Mendez's impairments or combination of impairments "meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Id.  Specifically, the ALJ determined that Mendez's mental impairment does not satisfy listing 12.04 because the

mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration.  Id.

Next, the ALJ found that Mendez has the "residual functional capacity ["RFC"] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)."  Id.  On this point, the ALJ found that Mendez could "lift and carry 10 pounds occasionally and less than 10 pounds frequently and stand and walk for at least 2 hours in an 8-hour day and sit for 6 hours in an 8-hour day."  Id.  He found that she "can occasionally climb ramps/stairs, ladders, balance, stoop, kneel, crouch and crawl" and that she "can do simple, routine, repetitive tasks."  Id.  In reaching this finding, the ALJ noted that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  R. 19.  He also considered "opinion evidence."  Id.  With respect to Mendez's symptoms, the ALJ followed a two-step process under which it is first determined "whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms."  Id.  Next, once such an underlying impairment has been shown, the ALJ "evaluate[s] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning."  Id.  For purposes of the second step of this analysis, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by the objective medical evidence, [the ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record."  Id.

The ALJ summarized the evidence of record on which he had relied in making his RFC determination.  He noted that there was evidence of "sporadic" treatment from August 2004

through December 2007 at Ryan-Nena Community Health Center for complaints of back pain. Id. An x-ray of the lumbar spine performed on August 18, 2004, showed muscle spasms. Id. An MRI of the lumbosacral spine from February 20, 2008, showed paracentral posterior herniated discs at the L3-L4 and L5-S1 level and a bulging disc at the L4-L5 level. Id. The ALJ also summarized Mendez's consultative examination with Dr. Aurelio Solon, an internist. Id. Dr. Solon diagnosed a history of diabetes mellitus and a history of peripheral neuropathy, as well as a history of low back pain and obesity. R. 20. Dr. Solon found that there were "no objective findings to support the fact that [Mendez] would be restricted in her ability to sit or stand or in her capacity to climb, push, pull, or carry heavy objects." Id. The ALJ summarized progress notes from Gouverneur Diagnostic and Treatment Center from August 2008 through August 2010 indicating treatment for diabetes mellitus and vaginal bleeding after a pregnancy as well as low back pain and a referral for physical therapy. Id. Several notes from the end of this period indicated that the low back pain had improved, and a note from September 2011 indicated that Mendez "was followed for diabetes mellitus without any evidence of complications, and hyperlipidemia for which she was going to be started on medications." Id.

Psychiatric progress notes from Dr. Laura Polonia dated July 26, 2010, indicated treatment for a major depressive disorder. Id. A note from August 19, 2010, indicated improvement of her condition, and a note from September 2010 indicated prescriptions for Trazodone and Zoloft. Id. According to the September 2010 note, there was no evidence of hallucinations or delusions, concentration and memory were good, and insight and judgment were fair. Id. That note also indicated that Mendez "needed to continue on psychotherapy in order to maintain a stable mental status." Id. Notes from December 10, 2010, through November 2011 showed normal psychomotor activity and a normal thought process. Id. A

"mental residual functional capacity evaluation" dated November 22, 2011, indicated the following: slight limitations in Mendez's capacity to understand and remember simple instructions, carry out simple instructions, and ability to make judgments or simple work related decisions; slight limitation in ability to maintain socially appropriate behavior; moderate limitation in ability to maintain attention and concentration for extended periods and interact with supervisors or co-workers; and marked limitation in capacity to understand and remember detailed instructions and respond appropriately to usual work situations and to changes in a routine work setting.  Id.

After considering the evidence of record, the ALJ found that, despite Mendez's herniated and bulging discs, Mendez had "minimal care for this condition or her complaints of pain." R. 21.  The ALJ found that Mendez had undergone intermittent physical therapy, but that there was no evidence or history of surgery, and that since October 2010, she appeared not to be under care for that condition.  Id.  Moreover, the record did not reflect "objective findings that substantiate a severe condition that would result in disabling pain or preclude the performance of work activities."  Id.  The ALJ further reasoned that, based on the evidence of record, it "could not be reasonable to conclude that the minimal findings could be the basis for the degree of pain alleged" by Mendez.  Id.  He concluded that the "pain is not of such frequency[,] intensity or duration as to be disabling."  Id.  The ALJ added that this condition "should adequately respond to medication and proper medical management" and that, although the pain is worsened by heavy lifting or carrying, Mendez should otherwise function adequately.  Id.  He also noted that Mendez has been treated for diabetes mellitus with some reports of peripheral neuropathy, but the "reports indicated that gait was normal" and there is "no evidence of sustained disturbance of gross and dexterous movements, or gait and station."  Id.  As for Mendez's headaches, the ALJ

11

stated that Mendez has complained of them since childhood, but they "never prevented her from working." Id. Lastly, regarding Mendez's treatments for a major depressive disorder, the ALJ noted that Mendez was "logical, coherent, and relevant [sic] in contact with reality, and alert and well-oriented." Id. He found no evidence of "any perceptual disorders" and stated that Mendez's "thoughts were free of psychotic content." Id.

The ALJ also accepted the opinion of the vocational expert that Mendez could perform the jobs of food and beverage order clerk, surveillance system monitor, and addresser. R. 22. Based upon the vocational expert's testimony, the ALJ concluded that "considering [Mendez's] age, education, work experience, and residual functional capacity, [she] is capable of making a successful adjustment to work that exists in significant numbers in the national economy." R. 23. Therefore, the ALJ found Mendez was "not disabled." Id.

## II. APPLICABLE LAW

### A. Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (citation and internal quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . "). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

accord Burgess, 537 F.3d at 127-28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006);

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation

and internal quotation marks omitted); accord McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir.

2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's

conclusion must be upheld.") (citation omitted).  Thus, "[i]f the reviewing court finds substantial

evidence to support the Commissioner's final decision, that decision must be upheld, even if

substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F.

Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).

The Second Circuit has characterized the "substantial evidence" standard as "a very deferential

standard of review — even more so than the 'clearly erroneous' standard."  Brault v. Soc. Sec.

Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  "The substantial

evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a

reasonable factfinder would have to conclude otherwise."  Id. (emphasis in original) (citation and

internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and

substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d

at 454 (citations and internal quotation marks omitted).

    B.  Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person

will be found to be disabled only if it is determined that his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy." Id. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that

the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see

also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must

determine whether the claimant is currently engaged in any "substantial gainful activity." 20

C.F.R. § 404.1520(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity,

the Commissioner must decide if the claimant has a "severe medically determinable physical or

mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of

impairments that "significantly limits [the claimant's] physical or mental ability to do basic work

activities . . . .," id. § 404.1520(c). Third, if the claimant's impairment is severe and is listed in

20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the

claimant must be found disabled. Id. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment

is not listed and is not equal to one of the listed impairments, the Commissioner must review the

claimant's residual functional capacity to determine if the claimant is able to do the work he or

she has done in the past, i.e., "past relevant work." Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

## III.  DISCUSSION

Mendez seeks reversal of the ALJ's decision on the following grounds: (1) the ALJ "improperly relied upon the medical expert's testimony at the hearing, and the inaudibility of the medical expert's testimony at the ALJ hearing prevents proper review of the ALJ's decision"; (2) the ALJ erred by "failing to properly evaluate the opinion from treating Nurse Practitioner Malz, thereby failing to support the residual functional capacity determination by substantial evidence"; (3) the ALJ "committed reversible error in failing to tender the post-hearing evidence to Plaintiff"; (4) the ALJ's "credibility determination is unsupported by substantial evidence because the ALJ erred in analyzing the required factors when assessing Plaintiff's credibility"; and (5) the ALJ "erred in determining that Plaintiff is capable of performing jobs which exist in significant numbers in the national economy."  Pl. Mem. at 13-22.

We address these grounds to the extent necessary to resolve the pending motion.

### A.  Medical Expert Testimony

Mendez asserts that although the ALJ accorded "great weight" to the opinion of the medical expert who testified at the hearing, the medical expert "never opined as to Plaintiff's function-by-function limitations" and "only provided the opinion that Plaintiff did not meet or

15

medically equal a listing requirement." Id. at 13.  Regarding any such limitations, Mendez

points out that "[a]t first the medical examiner opined [sic] the consultative examiner's findings

that Plaintiff had no restrictions of range of motions and no limitations was consistent with what

is documented elsewhere in the record . . . .   After this, however, the medical expert testified the

record was too insufficient to determine whether the consultative examiner's findings and

opinions were consistent with the record." Id.  As a result, Mendez argues, "it is unclear what

opinion the ALJ is referring to when he assigned 'great weight to the opinion of the medical

expert.'" Id.  This contention must be rejected, however, inasmuch as there is no doubt which

"opinion" the ALJ was relying on.  The ALJ's statement that he accorded great weight to the

opinion of the "medical expert" comes immediately after the ALJ summarized the testimony of

Dr. Rivera, who testified at the hearing.  R. 21.  Dr. Rivera's opinion was that Mendez's

conditions "either singly or in combination did not meet or equal the Listing of Impairments."

Id.; see R. 365.  Mendez provides no basis for challenging this opinion.

     Mendez also contends that the "state of the hearing testimony prevents proper review by

the court" because the "medical expert's testimony was inaudible on no less than 20 occasions."

Pl. Mem. at 15.  This is problematic, she argues, because "the testimony from the medical expert

was heavily relied upon by the ALJ" and was accorded "great weight," but the "pervasive

inaudibility of the medical expert's testimony puts the bases of the ALJ's conclusions . . . at a

loss." Id.  It is true that remand may be proper where omissions in a transcript prevent

meaningful review of an ALJ's decision.  See Pratts v. Chater, 94 F.3d 34, 37-38 (2d Cir. 1996)

("Without the benefit of a complete transcript, however, the bases for these conclusions were

lost to the ALJ, the Appeals Council, the district court, and now to us.").  In Pratts, however, a

"portion" of the medical expert's testimony was apparently missing from the transcript, and the

"ALJ referred extensively to [the medical expert's] testimony in her evaluation of the medical evidence and stated that she agreed with his conclusions." Id. at 38. The medical testimony was characterized as "missing." Id. at 39. We do not read Pratts to state a rule that remand is automatically required wherever there are problems with a transcript but rather that remand may be required where the problems affect the understanding of material portions of the testimony. Here, it is clear from the ALJ's opinion that the ALJ only relied on the medical expert's opinion that Mendez does not have a condition or combination of conditions that meet or equal the Listing of Impairments. R. 21. The portion of the transcript containing this testimony is unaffected by transcription problems. See R. 365. While the transcript has indications of "[inaudible]" in a number of places, the Court's reading of the transcript as a whole reflects that these indications represent brief gaps. The transcript makes the opinion of the expert and the basis for his conclusions reasonably clear. Thus, the problems with the transcription of the medical expert's testimony do not affect our ability to review the record.

     B. Opinion of Nurse Practitioner Eric Malz

     Mendez contends that the "ALJ discussed the opinion from Nurse Practitioner Malz, but erroneously failed to accord weight to the opinion and it is otherwise unclear from the decision." Pl. Mem. at 16. Mendez argues that the ALJ, in making the RFC determination, "did not account for or otherwise explain why portions of Nurse Practitioner Malz's opinion were not incorporated into the RFC." Id. at 17. The particular statement Mendez points to is contained in a November 22, 2011 "Mental Capacity Assessment" prepared by Malz. See Pl. Mem at 18; R. 279-82. At the bottom of the third page of the assessment, Malz wrote the following in a blank space (after a question asking him to "explain" whether Mendez can "manage benefits in . . . her own best interest"): "[Mendez] is able to function in her life in terms of taking her medication,

17

going for [appointments] and caregiving to her children.  But [she] is unable to work as she still

has poor coping skills to manage her stressors and regulate her emotions with severe

depression."  R. 281.

We first address several preliminary issues related to Malz's opinion and the ALJ's RFC

assessment.  In general, the ALJ must give "more weight to opinions" of certain of a claimant's

treating sources, such as a treating physician, when determining if a claimant is disabled.  See 20

C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir.

2004) (the ALJ must give "a measure of deference to the medical opinion of a claimant's

treating physician").  An ALJ must accord "controlling weight" to these sources as to the nature

and severity of a claimant's impairments if the opinion "is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the claimant's] case record . . . . "  Id. §§ 404.1527(c)(2), 416.927(c)(2).

However, as the Second Circuit has noted, the governing regulations make clear that the sources

to which such deference is owed consist exclusively of physicians, psychologists, and the three

other categories of "acceptable medical sources" listed in 20 C.F.R. § 404.1513(a).  Diaz v.

Shalala, 59 F.3d 307, 313 (2d Cir. 1995).  Thus, "under no circumstances can the regulations be

read to require the ALJ to give controlling weight to" the opinion of any other source.  Id. at 314

(emphasis omitted).  Nurse practitioners are not included in the list of "acceptable medical

sources."  See 20 C.F.R. § 404.1513(a).  Thus, their opinions do not come within the treating

physician rule.  See Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008) (Commissioner's

argument that "physician's assistant" and "nurse practitioner" were not "acceptable medical

sources" under the treating physician rule was "compelling" and therefore "their assessments

[did] not warrant the same deference as a physician's opinion").  Accordingly, the ALJ was not required to give controlling weight to Nurse Practitioner Malz's opinion.

To the extent Mendez contends that the ALJ failed to "weigh" Malz's opinion or "reconcile the RFC determination" with Malz's opinion, Pl. Mem. at 18, we reject this argument as well.  While an ALJ's RFC determination "must be set forth with sufficient specificity to enable [a court] to decide whether the determination is supported by substantial evidence," Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984), the Second Circuit does "not require that [the ALJ] have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability," Mongeur, 722 F.2d at 1040; see also Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) (rejecting argument that the ALJ must "explicitly . . . reconcile every conflicting shred of medical testimony").  Here, the ALJ acknowledged and summarized the contents of Nurse Practitioner Malz's mental residual functional capacity evaluation dated November 22, 2011. R. 20.  That the ALJ's ultimate RFC determination did not incorporate every limitation assessed by Malz does not constitute error.  Rather, an ALJ's RFC assessment is proper if it is supported by substantial evidence in the record.  See, e.g., Poupore, 566 F.3d at 306 (upholding ALJ's residual functional capacity assessment where it was supported by substantial evidence).  Aside from Mendez's contentions that the ALJ failed to adequately "weigh" Malz's opinion or explain why portions of it were rejected, Mendez does not supply any reason to conclude that substantial evidence to support the RFC assessment was lacking.  Indeed, the ALJ's RFC assessment is consistent in many ways with Malz's opinion.  Malz assessed only slight limitations to Mendez's ability to carry out very short and simple instructions and to make simple work-related decisions. See R. 279-80.  While Malz found marked limitations to Mendez's ability to "perform at a

19

consistent pace with a standard number and length of rest periods," R. 280, the ALJ could view this finding as inconsistent with Malz's repeated findings that Mendez had "good concentration" and that her insight and memory were "fair."  See, e.g., R. 286, 287, 289, 291, 292, 295, 297, 301, 303, 305, 307, 309.  There was also other record evidence which the ALJ could use to discount Malz's view that Mendez could not cope with stress or regulate her emotions, including her work history and treatment notes regarding her functioning as described in the ALJ's decision.  See R. 20.  Contrary to Mendez's argument, Pl. Reply at 2, these are not "post-hoc rationalizations" provided by the Commissioner but rather are matters discussed in the ALJ's decision.  Particularly given that Malz was not a treating physician, the ALJ was not required to explain how each statement in Malz's notes that was arguably inconsistent with the ALJ's RFC determination was specifically countered by evidence that the ALJ had already described in his opinion.  As a result, Mendez's argument that the ALJ improperly failed to accept all of Malz's views on her limitations must be rejected.

      C.  The ALJ's Determination on Obesity and Migraines

      Mendez argues that the "ALJ failed to evaluate [her] obesity."  Pl. Mem. at 20.  Although the argument is difficult to follow, Mendez appears to assert that the ALJ erred in rejecting her subjective statements about the effects of her impairments without considering whether her obesity supported the credibility of these statements.  But the ALJ referred to Mendez's obesity several times in his written decision, see R. 19, 20.  More importantly, Mendez provides no explanation as to how a proper consideration of her obesity would indicate a lack of substantial evidence for the ALJ's credibility determination.  See generally Mancuso v. Astrue, 361 F. App'x 176, 178 (2d Cir. 2010) (ALJ did not err in consideration of obesity where "there [was] no factual basis for thinking that 'any additional and cumulative effects of obesity' limited [the

claimant's] ability to perform light work") (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00Q).

Mendez argues that the ALJ improperly failed to credit her claim that her migraine headaches cause her to have "three bad days per week, and on a bad day she cannot get up to prepare a meal and just stays in bed." Pl. Mem. at 20. She notes that she had testified that these "bad days" occur "even with medication." Id. at 20. There are also hospital records that reflect that Mendez has regularly complained of such headaches.

"It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999). Nonetheless, where credibility regarding the claimant's RFC, regulations impose some burden on the ALJ to explain his or her decision. As the Second Circuit stated:

> When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929; see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).
>
> The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the

21

> extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.  Id. The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96–7p.

Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2009).

Here, Mendez claims that she experiences migraines twice a week, that the symptoms can last from a couple of hours to days, and that she is essentially incapacitated while they occur. R. 330, 345-49.  While the ALJ notes that Mendez's migraines constitute a "severe" impairment, R. 18, he otherwise barely mentions the headaches in his decision.  Other than a single reference to the fact that the headaches had not prevented her from working previously, R. 21, he gives no explanation at all as to why he discounted Mendez's claim that they rendered her unable to work. This is particularly important since Mendez claimed that her headaches had gotten worse since she stopped working, R. 328-29, and thus her ability to work was not necessarily dispositive of the question of whether her claims as to the disabling nature of the headaches should be credited. For her part, the Commissioner points to evidence that might justify the adverse credibility determination, Comm'r Mem. at 15, but under the regulations and case law it is for the ALJ to give an explanation in the first instance.  Accordingly, this matter must be remanded for the ALJ to make a credibility finding in accordance with the governing regulations as to Mendez's assertions that her migraine headaches render her unable to work.

### D.  ALJ's Failure to Tender Post-Hearing Evidence

Mendez asserts that the ALJ "received post hearing evidence in the form of interrogatories from the vocational expert" but that this evidence "was not provided for Plaintiff

to review." Pl. Mem. at 19. Mendez asserts this was error, relying on the Social Security

Administration's Hearings, Appeals, and Litigation Law Manual ("HALLEX") I-2-5-28, which

states, in relevant part, that if an ALJ

> receives new evidence after the hearing from a source other than the claimant, and
> the ALJ proposes to enter the evidence into the record as an exhibit, the ALJ must
> give the claimant and that claimant's representative the opportunity to review and
> comment on the evidence and to request a supplemental hearing unless . . . the
> claimant or the representative knowingly waived the right to review the evidence
> and to appear at a supplemental hearing, or . . . the ALJ is prepared to issue a fully
> favorable decision.

I-2-5-28(E), 1992 WL 601812.

     While the Commissioner concedes that the ALJ "apparently failed . . . to provide the

plaintiff an opportunity to review and comment upon this additional evidence prior to the

issuance of the ALJ's decision," she argues that the HALLEX lacks the force of law. Comm'r

Mem. at 20 (citing cases). It is not necessary to reach this question, however. Because the case

is to be remanded for further proceedings anyway, the ALJ, on remand, should follow the

procedures contained in the HALLEX with respect to the post-hearing evidence previously

received.

     E.  <u>The ALJ's Determination that Mendez is Capable of Performing Jobs Which Exist in</u>
         <u>Significant Numbers in the National Economy</u>

     Mendez notes that the ALJ "relied upon the testimony and interrogatories of a

[vocational expert] in determining that 'there are jobs that exist in significant numbers in the

national economy that [Plaintiff] can perform.'" Pl. Mem. at 21 (second alteration in original).

She argues, however, that "this testimony cannot provide substantial evidence to support the

ALJ's decision because it was based upon an incomplete hypothetical question." Id. Mendez

contends that the hypothetical was "incomplete" because it "failed to include Nurse Practitioner

Malz's opinion as to Plaintiff's mental limitations." Pl. Mem. at 22. To the extent that Mendez is referring to the hypothetical question asked by the ALJ at the hearing, her contention must be rejected, as the hearing took place on November 9, 2011, see R. 321, and Malz did not render the opinion on which Mendez relies until November 22, 2011, see R. 282. If Mendez is instead referring to the hypothetical contained in the post-hearing interrogatory to the vocational expert, this argument is also without merit. An ALJ's hypothetical question to a vocational expert is acceptable if there is "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983). Here, even taking into consideration the limitations contained in Malz's opinion, we cannot conclude that the assumptions built into the ALJ's post-hearing hypothetical were contradicted by that opinion. In fact, the hypothetical is consistent with the limitations assessed by Malz, see R. 279-282, inasmuch as the hypothetical assumed an individual who was "limited to simple, routine, repetitive work," R. 384. Malz himself found that Mendez had only slight limitations to her ability to carry out very short and simple instructions and to make simple work-related decisions. R. 279-80.

Mendez notes that Malz found that Mendez had "marked" limitations in her ability to "perform at a consistent pace with a standard number [and] length of rest periods" and "moderate" limitations with respect to working with others, completing a workday, maintaining attention and concentration for extended periods, and interacting with others. Pl. Mem. at 22 (citing R. 279-80). But the ALJ was not required to accept these findings in determining the RFC, and there is substantial evidence to support the ALJ's rejection of Malz's conclusions including Malz's repeated findings that she had "good concentration." See R. 286, 289, 291, 292, 295, 297, 301, 303, 305, 307, 309. Mendez has not made an argument that the ALJ's

24

conclusion that Mendez is able to perform simple, routine, repetitive work was not supported by substantial evidence other than her arguments regarding the failure to accept Malz's opinion, which we have already discussed.  As a result, the hypothetical question was properly posed, and the vocational expert's response to it could have been properly adopted by the ALJ in arriving at a disability determination.

IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 21) and the plaintiff's motion for judgment on the pleadings (Docket # 14) are granted in part and denied in part.  The case is remanded for further proceedings before the Commissioner consistent with this Opinion.  The Clerk is requested to enter judgment and to close this case.

SO ORDERED.

Dated: December 9, 2014
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge